**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL S. HAMMERLY,<br><br>        Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>        Defendant. | CASE NO. 5:23-CV-01211<br><br>DISTRICT JUDGE JAMES S. GWIN<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br><u>**REPORT AND RECOMMENDATION**</u> |

Plaintiff Michael S. Hammerly ("Plaintiff" or "Mr. Hammerly") seeks judicial review of
the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his
application for Supplemental Security Insurance ("SSI").  (ECF Doc. 1.)  This Court has
jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned
Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **VACATE**
and **REMAND** the final decision of the Commissioner for further proceedings consistent with
this Report and Recommendation.  On remand, the ALJ should consider all evidence of record
and provide a clear and accurate explanation for his findings as to the persuasiveness of the
medical opinion evidence and Plaintiff's subjective symptom reports, accurately characterizing
the medical evidence and building a logical bridge between the evidence and the result.

## I.        Procedural History

Mr. Hammerly filed his SSI application on March 4, 2021.  (Tr. 63, 173.)  He alleged a
disability onset date of March 4, 2021.  (Tr. 75, 173.)  He alleged disability due to depression,

anxiety, and unspecified psychosis.  (Tr. 75.)  After an initial denial by the state agency (Tr. 84-87) and denial upon reconsideration (Tr. 97-98), Mr. Hammerly requested a hearing (Tr. 99-101).  A telephonic hearing was held before an Administrative Law Judge ("ALJ") on June 15, 2022.  (Tr. 35, 142.)  The ALJ issued an unfavorable decision on July 14, 2022, finding Mr. Hammerly not disabled.  (Tr. 13-30.)  The Appeals Council denied his request for review of the ALJ's decision on May 11, 2022, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4.)  Mr. Hammerly then filed the pending appeal.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 8, 9, 10.)

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Mr. Hammerly was born in 1987, making him a younger individual on the alleged onset date.  (Tr. 29.)  He had a General Education Diploma ("GED") and no past relevant work.  (*Id.*)

### B.      Medical Evidence

Although the ALJ identified severe mental and physical impairments (Tr. 19), Mr. Hammerly bases his appeal on a medical source opinion and symptoms relating to his severe mental impairments (ECF Docs. 8, 10).  The evidence summarized herein therefore focuses on Mr. Hammerly's mental impairments.

#### 1.      Relevant Treatment History

On December 14, 2020, Mr. Hammerly presented to Scott A. Poland, M.D., at the Summa Akron City Hospital's emergency department to be medically cleared for psychiatric evaluation, treatment, and admission to the voluntary unit at Portage Path Psychiatric Services emergency services.  (Tr. 257-95.)  He complained of depression and auditory and visual hallucinations, but denied suicidal or homicidal ideations.  (Tr. 257, 261.)  Dr. Poland noted no

active signs of internal stimuli, despite his endorsing hallucinations.  (Tr. 261.)  Drug and alcohol panels were normal.  (*Id*.)  Mr. Hammerly was medically cleared and transferred back to Portage Path Psychiatric Services psychiatric emergency services in stable condition.  (*Id*.)

Mr. Hammerly was voluntarily admitted to the Portage Path Behavioral Health Emergency Services Emergency Evaluation / Crisis Stabilization Unit from December 15 to December 28, 2020.  (Tr. 312-21.).  He reported that he had been living with his mother in a duplex but could no longer pay rent after his mother moved out in November; he had no income, but anticipated receiving food stamps.  (Tr. 315.)  He complained of severe anxiety, severe depression, severe mood swings, auditory and visual hallucinations, crying for no reason, sleep problems, chronic suicidal ideation, constant paranoia, daily panic attacks, and said he was at "rock bottom"; he also reported that these issues caused problems with concentration, focus, energy levels, and short-term memory.  (Tr. 316-317).  He explained that he had never seen a psychiatrist, but recently had an intake at Portage Path Behavioral Services and was advised to come to emergency services.  (Tr. 317.)  He reported hearing voices since he was 19 years old and seeing shadows for the past five years, but felt that hearing voices was normal.  (Tr. 318.)

Mr. Hammerly was examined by Syed Alam, M.D., upon admission to the Crisis Stabilization Unit ("CSU").  (Tr. 326-28.)  Dr. Alam noted that Mr. Hammerly appeared anxious and depressed, with his major stressor being "in the process of eviction due to non-payment of rent."  (Tr. 327.)  On examination, Mr. Hammerly was calm, cooperative, and appropriately groomed; his eye contact was appropriate, and he engaged easily during the interview.  (Tr. 326.)  His speech was normal, and he did not demonstrate psychomotor agitation or retardation.  (*Id.*)  He reported his mood was "alright"; his affect was mood congruent but anxious.  (*Id.*)  He was alert and oriented, with no deficits in attention or concentration, and his thought processes were

3

organized, linear, and goal directed.  (*Id.*)  He did not endorse auditory or visual hallucinations and did not appear to be responding to hallucinatory stimuli.  (*Id.*)  His insight and judgment were fair.  (*Id.*)  Dr. Alam diagnosed generalized anxiety disorder ("GAD"), unspecified depressive disorder, and unspecified psychosis.  (Tr. 327-28.)  He continued Mr. Hammerly's current medications, Zyprexa for mood and Vistaril as needed for anxiety, and started Zoloft for depression and anxiety.  (Tr. 327.)  Various medication changes were made over the course of Mr. Hammerly's stay in the CSU.  (Tr. 315.)

Upon Mr. Hammerly's discharge on December 28, 2020, Marilena Achim, M.D., observed that he was well groomed, cooperative, and fully oriented, with clear speech, intact thought content and perceptions, normal memory, knowledge base, and language, and fair insight and judgment; but his thought associations were concrete and his affect was constricted/blunted.  (Tr. 319-20.)  His discharge diagnoses included: GAD; unspecified mood [affective] disorder; alcohol use disorder, severe, in early remission; and cannabis use disorder, mild, abuse.  (Tr. 320-321.)  His discharge medications included Zoloft, Clonidine, Latuda and Buspirone.  (Tr. 313.)  He was scheduled to follow up with Bob Waldsmith for individual therapy and with Mackenzie Kriss for medication management.  (Tr. 315.)

On December 30, 2020, two days after his discharge, Mr. Hammerly attended an initial medication management visit via telehealth with Mackenzie Kriss, PMHNP-BC.  (Tr. 344-49.)  He reported things were going a lot better since his CSU admission, but his anxiety was 7/10, his depression was 3/10, and he felt paranoid because he felt people were talking about him; he denied hallucinations.  (Tr. 345.)  He was living alone, had the support of his mother and grandmother, and tried to talk to a friend almost every day.  (*Id.*)  He had taken his medications since discharge, but reported his anxiety was still high and hydroxyzine "d[id]n't do much."

(*Id.*)  On examination, he was fully oriented with "good attention and concentration with minimal distractibility," normal and intact memory and perceptions, clear speech, logical thought processes, intact thought associations, grossly intact language, good awareness of current events and past history, and fair insight and judgment.  (Tr. 345-46.)  However, his thought content included paranoia.  (Tr. 346.)  NP Kriss indicated that she was "unable to assess" his mood and affect but also indicated his anxiety was severe and his depression mild.  (*Id.*)  She diagnosed: major depressive disorder, recurrent episode, severe with anxious distress; and alcohol use disorder, severe, in early remission.  (Tr. 347.)  She continued his Latuda for mood and psychosis, and increased Buspar for anxiety and Zoloft for anxiety and depression.  (Tr. 345, 347.)  Mr. Hammerly's interval process status was noted to be "improving."  (Tr. 349.)

Mr. Hammerly initiated community psychiatric supportive treatment ("CPST") with case manager Nickolas Butto, QMHS, on January 8, 2021 via telephone.  (Tr. 351-52.)  He was pleasant and easily engaged with Mr. Butto, and indicated that he needed housing and income, and that community services would help too.  (Tr. 351.)  He established a treatment plan with Mr. Butto on January 26, 2021.  (Tr. 360-69.)

He returned for a medication management telehealth visit with NP Kriss on January 26, 2021.  (Tr. 353-58.)  He reported anxiety due to an upcoming eviction proceeding and said he could not work.  (Tr. 354.)  He rated his depression at 5/10 and anxiety at 9/10, and reported irritability and paranoia; he denied auditory hallucinations, but said he sometimes could hear a cat meowing or a dog barking when there was nothing there; his sleep was "horrible" due to anxiety, and his appetite was "not there."  (*Id*.)  Mental status findings were similar to his initial visit, except that auditory hallucinations were noted and depression was rated as severe.  (Tr. 354-55.)  NP Kriss continued Latuda for mood/psychosis, buspirone for anxiety, and clonidine

5

for anxiety, and increased sertraline for anxiety/depression.  (Tr. 356.)  She again rated Mr. Hammerly's progress as "improving."  (Tr. 358.)

On January 29, 2021, Mr. Hammerly initiated individual psychotherapy with Robert Waldsmith, LPC, in a telehealth visit.  (Tr. 370-71.)  He requested that future therapy sessions be in-person.  (Tr. 370.)  He was anxious about a possible eviction and working with case management to apply for housing and SSI benefits.  (*Id.*)  On mental status examination, his affect was not assessed but he was cooperative with a euthymic mood, logical and goal-directed thought, and fair insight and judgment; there was no evidence of delusions or hallucinations.  (*Id.*)  Mr. Hammerly's past efforts to manage hallucinations and paranoid thinking were reviewed, and LPC Waldsmith discussed the importance of self-care habits and sleep.  (Tr. 371.)

Mr. Hammerly attended a case management session with Mr. Butto via telephone on February 15, 2021, where he discussed his housing application.  (Tr. 372-73.)  He was pleasant and engaged, but showed mild distress over his housing situation.  (Tr. 372.)  He then attended a therapy session in person with LPC Waldsmith on February 19, 2021.  (Tr. 374-75.)  He reported that he was working with a legal aid attorney for his eviction and working with case management on his benefits applications.  (Tr. 374.)  On examination, he was oriented and cooperative with an appropriate affect, logical and goal-directed thoughts, and fair insight and judgment; but his mood was anxious.  (*Id.*)  LPC Waldsmith rated his functioning as "somewhat poor," defined as "client is able to effectively function for sustained periods between clinical contacts."  (Tr. 375.)

Mr. Hammerly returned for medication management via telehealth with NP Kriss on February 23, 2021.  (Tr. 376-81.)  He complained of: "bad panic attacks"; depression at 7/10; anxiety at 4 or 5/10; and hearing voices that said things about him.  (Tr. 377.)  He was sleeping six hours per night and his appetite was "the same."  (*Id.*)  NP Kriss was unable to assess his

behavior or eye contact, but he was fully oriented with "good attention and concentration with minimal distractibility," clear speech, normal and intact thought content, associations, and memory, grossly intact language, good awareness of current events and past history, and fair insight and judgment.  (Tr. 377-78.)  However, his thought process was racing and his perceptions included auditory hallucinations.  (*Id.*)  NP Kriss again indicated that she was unable to assess mood and affect, but also that his anxiety was moderate and his depression was severe. (Tr. 378.)  She rated Mr. Hammerly's major depressive disorder as "worsening" and his interval progress as "deteriorating."  (Tr. 378, 381.)  She continued Latuda, buspirone, and clonidine, increased sertraline for anxiety/depression, and started hydroxyzine as needed for severe anxiety/panic.  (Tr. 379.)

Mr. Hammerly was pleasant and easily engaged at a case management visit with Mr. Butto on March 4, 2021, reporting that he felt a little better knowing he would not be evicted but still felt unstable and worried about paying rent when he was unable to work.  (Tr. 383-84.)  His mental status was unremarkable, and he was counseled on housing goals.  (Tr. 383.)  Mr. Hammerly canceled his therapy visit with LPC Waldsmith on March 15, 2021.  (Tr. 385.)

He returned for medication management with NP Kriss via telehealth on March 23, 2021. (Tr. 386-91.)  He reported that he had been working with his case manager and was not being evicted but was still working on getting new housing.  (Tr. 387.)  He was compliant with medication and felt it was working; he rated his depression at 5/10 and anxiety at 3/10.  (*Id.*)  He continued to feel paranoid when going out in public, but had not heard voices since the prior week, characterizing the voices as "not that serious."  (*Id.*)  He also complained of vivid dreams and nightmares.  (*Id.*)  NP Kriss continued to indicate that she was unable to assess mood and affect on examination, but also indicated that anxiety was mild and depression was moderate.

(Tr. 388.)  Examination findings were otherwise normal, with logical thought processes, intact associations, and normal and intact thought content and perceptions.  (Tr. 387-88.)  NP Kriss rated his diagnoses as "stable or improved" and his interval progress as "improving."  (Tr. 388, 391.)  She decreased clonidine for anxiety, started prazosin for nightmares, and continued Mr. Hammerly's other medications.  (Tr. 389.)

Mr. Hammerly attended a therapy visit with LPC Waldsmith on March 29, 2021, reporting that his mood was improved overall and prazosin was helping with nightmares.  (Tr. 392-93.)  He also reported that he had rescued a pregnant cat who just had a litter of five, and was working on a plan to get the kitten adopted and keep the mother.  (Tr. 392.)  Mental status findings were unremarkable and overall functioning was rated as "average," defined as "client is able to function just as effectively as most people."  (Tr. 392-93.)

At a case management appointment on April 1, 2021, Mr. Hammerly supported Mr. Hammerly during a telephone interview/application for SSI disability benefits.  (Tr. 394-95.)  While Mr. Hammerly was pleasant and easily engaged with Mr. Butto, he was dependent on Mr. Butto during the telephone interview and expressed anxiety throughout the call.  (Tr. 394.)

Mr. Hammerly did not return to medication management with NP Kriss until August 11, 2021, appearing for an in-person visit.  (Tr. 435-40.)  He reported that he was "doing good" and "settled in" after moving into a new residence in July, and that he met some new neighbors.  (Tr. 435.)  He was taking his medications regularly and thought they helped, but was recently feeling more anxiety.  (*Id.*)  He rated his depression at 2/10 and his anxiety at 7/10.  (Tr. 435-36.)  His coping skills included going for a walk and watching a movie.  (Tr. 436.)  He also reported a significant decrease in paranoia and hallucinations, and denied hearing voices in the last month.  (*Id.*)  His sleep was "alright" and there was no difference in his nightmares/dreams when he

stopped taking prazosin a week prior.  (*Id.*)  On examination, he was fully oriented and had

average behavior and eye contact, clear speech, logical thought processes, intact associations,

normal and intact perceptions and memory, good attention and concentration with minimal

distractibility, grossly intact language, good fund of knowledge, and fair insight and judgment.

(Tr. 436-37.)  However, his thought content included paranoia and he demonstrated moderate

anxiety and mild depression with an affect appropriate to mood.  (*Id.*)  His diagnoses included:

major depressive disorder, recurrent episode, severe with anxious distress; alcohol use disorder,

severe, in early remission; and nicotine use disorder.  (Tr. 437.)  NP Kriss indicated Mr.

Hammerly's major depressive disorder was "worsening," but his interval progress was "stable."

(Tr. 437, 440.)  She continued buspirone and clonidine for anxiety, hydroxyzine as needed for

severe anxiety/panic, and Zyprexa for mood/psychosis; she increased sertraline for

anxiety/depression, stopped prazosin for nightmares, and started trazodone for sleep.  (Tr. 438.)

Mr. Hammerly returned for therapy with LPC Waldsmith on August 30, 2021.  (Tr. 433-

34.)  He said he was happy to be in his own apartment and hoped to get a pet for companionship,

but was still having some anxious/depressive symptoms and paranoid thoughts.  (Tr. 433.)

Mental status findings were unremarkable, and overall functioning was "average."  (Tr. 432-33.)

He did not return for therapy with LPC Waldsmith until October 5, 2021, when he

reported that he was seeking food assistance and needed an exemption from the work readiness

requirement due to his mental health.  (Tr. 430-31.)  His mental status findings remained

unremarkable.  (Tr. 430.)  His overall functioning was "somewhat poor," defined as "able to

effectively function for sustained periods between clinical contacts."  (Tr. 431.)

On October 6, 2021, Mr. Hammerly returned to medication management with NP Kriss.

(Tr. 423-28.)  He reported that he was "alright" and settling in to his new apartment, and was

trying to meet his neighbors and be more social.  (Tr. 423.)  He had been taking his medications and believed the increase in sertraline helped a lot with his depression and anxiety.  (*Id.*)  He rated his depression as 1/10 and his anxiety as 4/10.  (*Id.*)  However, he reported seeing "ghosts/shadow people" in his apartment when he was paranoid or stressed.  (Tr. 423-24.)  He also reported hearing voices—his mother's, grandmother's, or friend's—maybe once per week, not nearly as often as before; he said he no longer heard demonic voices.  (Tr. 424.)  He was sleeping a lot more with trazodone, eight to sixteen hours per night.  (*Id.*)  He wanted to exercise more and discussed activities that he used to enjoy, like running, weightlifting, and biking.  (*Id.*)  He reported taking Zyprexa daily and NP Kriss reminded him to only take this as needed for paranoia/ anxiety/psychosis because it could worsen sedation; he indicated that he understood her advice.  (*Id.*)  On examination, he was oriented, with average behavior and eye contact, clear speech, logical thought processes, intact associations, normal and intact memory, good attention and concentration with minimal distractibility, grossly intact language, good fund of knowledge, and fair insight and judgment.  (Tr. 424-25.)  However, his thought content included paranoia, his perceptions included auditory and visual hallucinations, and he demonstrated moderate anxiety and mild depression.  (*Id.*)  NP Kriss rated his diagnoses as "stable or improving" and his interval progress as "improving."  (Tr. 425-26, 428.)  She stopped clonidine due to sedation, decreased trazodone for sleep, and continued all other medications.  (Tr. 426.)

Mr. Hammerly returned to therapy with LPC Waldsmith on October 26, 2021, reporting that he was reapplying for food assistance and needed verification of his status with Portage Path to exempt him from the work training requirement.  (Tr. 421-22.)  He reported his mood was stable on medications and he was having less auditory and visual hallucinations, but still had nightmares.  (Tr. 421.)  His mental status findings were unremarkable.  (*Id.*)  His overall

10

functioning continued to be rated as "somewhat poor." (Tr. 422.)  He attended case management via telephone with Mr. Butto on November 3 and 9, 2021, for assistance with his disability application and a voucher referral. (Tr. 417, 419.)  He was pleasant and easily engaged. (*Id.*)

Mr. Hammerly returned for medication management with NP Kriss on November 5, 2021. (Tr. 409-14.)  He was calm and cooperative but reported that he sometimes had a hard time feeling lonely and depressed because he did not have money or friends, and that he was feeling stressed dealing with disability. (Tr. 409.)  He was taking his medications daily, denied side effects, and reported noticing a difference with the last medication change, but said he was feeling more depressed since then. (Tr. 409-10.)  He rated his depression as 7/10 and his anxiety as 8/10. (Tr. 410.)  He reported that "the voices" were not "so predominant anymore," but he was seeing a new "body or being" that stood at the foot of his bed any time he was in bed; he saw it almost every night, watching him but not saying anything. (*Id.*)  He reported that it was something he saw was he was younger and was scary. (*Id.*)  He also reported being paranoid every day "that people were doing things or thinking bad about him." (*Id.*)  His sleep was "all over the place" and his appetite was decreased. (*Id.*)  As with his October visit, his thought content included paranoia and his perceptions included auditory and visual hallucinations, but his depression and anxiety had increased to severe, and his thought processes were racing; other mental status findings remained unremarkable. (*Compare* Tr. 424-25 *with* Tr. 410-11.)  NP Kriss rated his major depressive disorder as "worsening," and his interval progress as "deteriorating." (Tr. 411, 414.)  She decreased sertraline for anxiety/depression, increased Zyprexa for mood/psychosis, increased trazodone for sleep, and started Wellbutrin XR for depression/ motivation. (Tr. 412.)  In a diagnostic assessment update dated November 22, 2021,

NP Kriss updated Mr. Hammerly's primary diagnosis to schizoaffective disorder, depressive type, and added a secondary diagnosis of GAD.  (Tr. 488-89.)

Mr. Hammerly returned to NP Kriss for a medication management on December 16, 2021.  (Tr. 490-95.)  He reported one or two good days a week, and said his condition was about the same.  (Tr. 490.)  He noted some initial improvement in depression, motivation, and low energy with Wellbutrin, but "then it leveled out."  (*Id*.)  He rated his anxiety and depression both at 6/10.  (Tr. 491.)  He also reported increasing Zyprexa at bedtime "help[ed] his psychosis some, but he still [had] bad days."  (Tr. 490-91.)  He had not had visual hallucinations since starting Zyprexa, but still got paranoid and heard voices off and on every day; the voices did not "say anything negative or mean, just chatter."  (Tr. 491.)  He also complained of racing thoughts and hearing voices at night, which could keep him up.  (*Id*.)  As with his November visit, his thought content included paranoia, his thought processes were racing, and his perceptions included auditory hallucinations, but his depression and anxiety had reduced to moderate and he no longer complained of visual hallucinations; other mental status findings were unremarkable. (*Compare* Tr. 410-11 *with* Tr. 491-92.)  NP Kriss rated all diagnoses as "stable or improved" and opined that his interval progress was "improving."  (Tr. 493, 495.)  She increased Wellbutrin XL for depression/motivation and continued all other medications.  (Tr. 493.)

Mr. Hammerly attended individual therapy with LPC Waldsmith on December 22, 2021, where he reported that he was compliant with medications and managing his mood and auditory hallucinations effectively.  (Tr. 497-98.)  He had resolved his food assistance issues and was continuing his SSI appeal.  (Tr. 497.)  His mental status findings were unremarkable.  (*Id.*)

On January 14, 2022, Mr. Hammerly attended a medication management visit with NP Kriss.  (Tr. 499-504.)  He appeared calm and cooperative and said he was "okay," but reported

that he was stressed because he found out his disability application was denied again, and was angry/frustrated with how difficult it was to be approved for benefits.  (Tr. 499-500.)  He had been taking his medications and reported that the Wellbutrin increase had "helped a little bit." (Tr. 499.)  He rated his depression at 7/10 and his anxiety at 8/10.  (Tr. 500.)  He reported being paranoid around people, hearing voices daily (not command or threatening), hearing "random noises" like knocking, and seeing a shadow figure at the end of the bed at night.  (*Id.*)  He said trazodone was no longer effective for sleep.  (*Id.*)  Mental status findings were similar to his December visit, except that he again reported visual hallucinations and his anxiety was increased to severe.  (*Compare* Tr. 491-92 *with* Tr. 500-501.)  NP Kriss rated all diagnoses as "stable or improved" and opined that his interval progress was "stable."  (Tr. 501, 504.)  She increased trazodone for sleep and continued all other medications.  (Tr. 501-02.)

On February 10, 2022, Mr. Hammerly attended therapy with LPC Waldsmith via telephone.  (Tr. 506-07.)  Mr. Hammerly reported that he still had anxiety and depression despite medication compliance; he also reported loss of appetite and night terrors.  (Tr. 506.)  He was depressed and anxious on examination, with no other noted abnormalities.  (*Id.*)  LPC Waldsmith rated his overall functioning as "somewhat poor," defined as "able to effectively function for sustained periods between clinical contacts."  (Tr. 507.)

Mr. Hammerly attended medication management with new provider Vhari Kashay, PMHNP-BC, at Portage Path on February 11, 2022.  (Tr. 509-14.)  He was calm and cooperative, reported taking his medications as prescribed, denied side effects, and said that his medications were working.  (Tr. 509.)  He rated his depression and anxiety both at 6/10.  (Tr. 509-10.)  He reported that most of his difficulties were caused by living in a bad neighborhood; there was a lot of music and yelling that could be bothersome.  (*Id.*)  His sleep and appetite were okay, and he

13

had a panic attack two weeks prior.  (Tr. 510.)  On examination, he was oriented with average activity and eye contact, clear speech, logical thought processes, intact associations, normal and intact thought content, perceptions, and memory, good attention, concentration, and fund of knowledge, fair insight and judgment, but mild to moderate anxiety and depression.  (Tr. 510-11.)  His diagnoses were rated as "stable or improved," and his interval progress was "stable." (Tr. 512, 514.)  His medications were continued.  (Tr. 512.)

Mr. Hammerly next saw LPC Waldsmith for therapy on March 9, 2022.  (Tr. 516-17.) He reported feeling groggy, and said his sleep was sometimes irregular.  (Tr. 516.)  He also reported difficulty focusing on an activity for more than half an hour.  (*Id*.)  His mood was depressed, but other mental status findings were unremarkable.  (*Id*.)  LPC Waldsmith again rated his functioning as "somewhat poor."  (Tr. 517.)

He returned to medication management with NP Kashay on March 25, 2022.  (Tr. 518-23.)  He continued to be pleasant and cooperative and reported medication compliance without side effects.  (Tr. 518.)  He said his depression was "pretty manageable" at 6/10, and that his anxiety was 6/10 and "situational."  (*Id*.)  He continued to complain of noise and fighting in his building, reporting that he said hello to people but kept to himself.  (Tr. 519.)  He reported "randomly experience[ing] paranoia associated with [auditory hallucinations]," explaining that the heard voices or music several times per week.  (*Id*.)  He felt that olanzapine was helpful because he was no longer hearing things every day, which he felt was "a big improvement." (*Id*.)  His examination findings changed from his February visit to reflect paranoia and auditory hallucinations.  (Tr. 519-20.)  His diagnoses continued to be rated as "stable or improved," his interval progress was "stable," and his medications were continued.  (Tr. 521, 523.)

14

He next attended therapy with LPC Waldsmith on April 4, 2022.  (Tr. 526-27.)  He reported anxiety over his upcoming SSI benefits hearing, continued nightmares affecting his sleep, and "see[ing his] deceased grandfather at times."  (Tr. 526.)  His mood was anxious on examination, but other findings were unremarkable.  (*Id.*)  LPC Waldsmith again rated his overall functioning as "somewhat poor."  (Tr. 527.)

Mr. Hammerly returned for medication management with NP Kashay on May 10, 2022. (Tr. 530-36.)  He was pleasant but appeared anxious, reporting his depression had been "ok" but his anxiety had been bad; he was worried about an upcoming SSI hearing, and was frustrated with the process.  (Tr. 530-31.)  He reported recent auditory hallucinations like a person's voice, music, and a cat meowing; he used Zyprexa when this occurred and it was helpful.  (Tr. 531.) He was only sleeping about four hours per night.  (*Id.*)  NP Kashay "noted an essential tremor to [Mr. Hammerly's] right hand that was not present at last visit" and counseled him on starting propranolol for tremor/anxiety.  (*Id.*)  His mental status examination findings were unremarkable, except that his perceptions included auditory hallucinations and his mood showed moderate anxiety and mild depression.  (Tr. 531-32.)  NP Kashay indicated his schizoaffective disorder was stable or improved, but his GAD was worsening.  (Tr. 533.)  She initiated Propanolol for side effects and anxiety, and continued his other medications.  (Tr. 534.)

## 2.    Opinion Evidence

### i.    Treating Source

On November 17, 2021, NP Kriss completed a "Medical Source Assessment (Mental)" form.  (Tr. 404-06.)  In the check-box portion of the form, she rated Mr. Hammerly's functional limitations using a checkbox scale as follows:

- "*noticeable difficulty*" for more than 20% of the work day for the majority of categories, namely: remembering locations and work-like procedures;

15

understanding and remembering detailed instructions; carrying out detailed instructions; performing within a schedule/having regular attendance; work in proximity to others without distraction; make simple work-related decisions; interact appropriately with general public; accept instructions and respond appropriately to criticism; get along with coworkers without distracting them/exhibiting behavioral extremes; maintain socially appropriate behavior and hygiene; be aware of and  respond to hazards; set realistic gaols or make independent plans.  (Tr. 404.)

- *"not able to perform"* the following: maintain attention and concentration for extended periods; complete normal workday and workweek without interruptions from psychologically passed symptoms and to perform at consistent pace without unreasonable number and length of rest periods; respond appropriately to workplace changes; travel in unfamiliar places or use public transit.  (Tr. 404-05.)

- "*able to perform but will have noticeable difficulty"* 11 to 20 % of workday: understand and remember very short, simple instructions; carry out very short and simple instructions; sustain ordinary routine without special supervision; ask simple questions or request assistance.  (Tr. 404.)

NP Kriss also opined that Mr. Hammerly would be absent more than four days per month due to his impairments or treatment, would be off task over 20% of the work day due to his mental health symptoms, and would need more than four breaks per day, lasting about 20-30 minutes each, outside of normally scheduled lunch and breaks.  (Tr. 405.)

Asked to provide the "medical findings" to support her opinions, NP Kriss identified Mr. Hammerly's diagnoses of schizoaffective disorder, depressive type, and generalized anxiety disorder and stated that Mr. Hammerly "has symptoms of anxiety, depression, and psychosis that can be severe and can cause issues with or interfere with his ability to maintain or attain employment."  (Tr. 406.)  Asked to provide other information relevant to the determination whether Mr. Hammerly could maintain full-time employment, NP Kriss wrote:

> [Mr. Hammerly] struggles with attendance, following and understanding instructions, and being able to complete tasks correctly due to his mental health symptoms.  Stress worsens his symptoms, and he reports that he has had problems with hallucinating while at work.  He would require many breaks in order to get back on task.

16

(*Id.*)

### ii.    Psychological Consultative Examiner

On July 12, 2021, Mr. Hammerly was seen by clinical neuropsychologist Joshua Magelby, PhD., for a psychological consultative examination.  (Tr. 396-403.)  He came independently, driven to the appointment by his mother, and arrived fifteen minutes early.  (Tr. 396.)  The methods and sources of data included a psychiatric history and complete mental status examination, with collateral information from SSA that included the December 2020 discharge summary from his CSU admission.  (*Id.*)  Psychological testing was not requested.  (*Id.*)

Mr. Hammerly complained of anxiety and depression, which caused him to forget things while working, and "decades" of seeing and hearing things.  (Tr. 396.)  He completed ninth through eleventh grade at Bridges Learning Center due to learning and emotional/ behavioral difficulties, and obtained his GED in 2017.  (Tr. 397.)  His grades were low and his peer relationships were fair to poor because he did not talk to or trust anyone.  (*Id.*)  His work history included 3-4 months as a factory worker and 2-3 months as an apprentice glazer in 2019.  (*Id.*)  He was fired for attendance issues that stemmed from health issues and "drinking a lot."  (*Id.*)  His co-worker relationships were poor, but relationships with supervisors were "regular."  (*Id.*)

His psychiatric treatment history began in December 2020, but his symptoms of anxiety and depression began in adolescence and his psychotic symptoms began five to six years before.  (Tr. 397.)  He reported his treatment with medication and counseling was helpful with depression and anxiety, and that "the seeing and hearing things, it's slowed down a lot."  (*Id.*)  He described his mood as "anywhere from lows to highs" but "mainly lows" since adolescence because he felt like a failure.  (Tr. 398.)  Regarding psychosis, he started hearing voices in late adolescence or his early 20s, hearing familiar voices that were either positive or fighting.  (*Id.*)  On three

17

occasions, he became paralyzed and heard a demon that spoke in tongues.  (*Id*.)  He denied that the voices he heard were command-oriented, but said he continued to have auditory or visual hallucinations three or four times a week, without connection to his mood.  (*Id*.)  He felt anxious in crowds because he thought people were talking about him and did not trust other people, except for a couple of family members.  (*Id*.)  He had much less interest in social interaction after a person he was with was shot at.  (*Id*.)  He did not report hospitalizations other than the one in 2020, and said he abused alcohol to self-treat depression from age 18 through 33.  (*Id*.)  He admitted to two misdemeanor arrests, most recently in 2009 for giving alcohol to minors.  (*Id*.)

Mr. Hammerly reported that he lived alone in a duplex.  (Tr. 398.)  He was capable of taking care of his personal hygiene needs and mostly capable with independent activities of daily living, organizing his living environment, and communicating his wants and needs.  (Tr. 398-99.)  His adaptive behaviors, like using public transportation, were not a significant problem.  (Tr. 399.)  His ability to shop, pay bills, and count change seemed mostly functional.  (*Id*.)  His social activities were limited to spending time with his mother and calling or texting his grandmother or a friend, and his ability to get along with friends, neighbors, or peers was somewhat limited. (*Id*.)  Resolving daily problems was adequate and use of community resources was good.  (*Id*.) Overall, Mr. Hammerly needed minimal help when considering his adaptive skills, but his coping skills were somewhat limited.  (*Id*.)

On mental status examination, Mr. Hammerly presented appropriately with fair hygiene, appropriate dress, orientation x4, normal gait and eye contact, and generally composed behavior. (Tr. 399.)  The other mental status findings are summarized below:

- *Flow of Conversation and Thought Content*: Unremarkable and all within normal limits.  (Tr. 399.)

- *Affect and Mood*: Affect was somewhat flat and restricted but mood congruent; no signs of depression, unstable mood, or agitation/restlessness were observed. (Tr. 399-403.)

- *Anxiety and Mental Content*: No observed signs of anxiety, panic disorder, obsessions/compulsions, hallucinations, suicidal/homicidal ideations, or evidence of Mr. Hammerly being a danger to self or others. (Tr. 400.)

- *Cognition*: Mr. Hammerly was assessed as "fairly average" with task engagement and effort within normal limits. Simple, sustained, and divided attention were unremarkable.  But he scored low on delayed auditory recall and serial 7's (poor).  Overall, Dr. Magelby saw no clear symptoms of attentional deficits, diminished mental capacity or delayed processing speed, and found his intelligence to be low average.  (Tr. 400.)

- *Judgment and Insight*: Findings were generally "fairly adequate" except for: ability to problem-solve or consider alternatives, and behavioral control— which were "somewhat limited."  (*Id*.)

Dr. Magelby diagnosed: schizoaffective disorder, bipolar type, unspecified; generalized anxiety disorder; alcohol use disorder, in early remission; and unspecified cannabis-related disorder.  (Tr. 401.)  Given Mr. Hammerly's history and presentation, including reported and observed symptoms on examination, Dr. Magelby opined that Mr. Hammerly's symptoms appeared to be chronic.  (Tr. 402.)

Dr. Magelby then provided the following functional assessment, in pertinent part:

1) The claimant's ability to understand, remember and carry out simple oral instructions is adequate . . . . Comprehension seemed average. Memory appeared adequate in general but the claimant's ability to follow more complex instructions or directions appeared to be at least somewhat impaired for age expectations.

2) The claimant was not overly distracted on exam and seemed able to follow the procedures. The claimant's ability to maintain attention and concentration seemed adequate overall compared to other adults the same age. Persistence and pace [was] more than adequate with cognitive tasks. The ability to perform a simple repetitive task, based on mental status and history, appeared more than adequate, though the ability to perform multi-step tasks appeared to be somewhat impaired overall for age expectation.

3) The claimant's ability to relate to others, such as, peers, fellow workers and/or supervisors has been without significant incident per se but at least somewhat impaired, which seems to be longstanding, by anxiety and psychotic disorder

symptoms. . . . His social relating during this evaluation was fairly appropriate throughout, however.

4) From a psychiatric standpoint, the claimant's ability to withstand the mental stress and pressures associated with day-to-day work activity appears at least somewhat impaired at this time, mostly by GAD and psychotic/mood disorder. He may also experience some decline in coping due to effects from early remission from longstanding alcohol abuse. This is supported by the claimant's current mental complaints on this exam, psychiatric history and estimated adaptive behaviors at this time.

(Tr. 402-03.)

### iii.    State Agency Psychological Consultants

On August 3, 2021, state agency psychological consultant Michael Cremerius, Ph.D., reviewed Mr. Hammerly's file and opined that Mr. Hammerly could: understand and remember simple instructions; perform simple, routine tasks; have brief and superficial contact with co-workers and supervisors and no contact with the public; and adapt to only routine changes in a workplace setting with no fast-paced tasks involving strict production quotas, though variable tasks with end-of-day production quotas would be acceptable.  (Tr. 70-72.)

On reconsideration on December 24, 2021, state agency psychological consultant David Dietz, Ph.D., affirmed Dr. Cremerius's RFC findings.  (Tr. 79-81.)

### C.    Function Report

Mr. Hammerly completed a function report on November 16, 2021.  (Tr. 194-203.)  He stated that his anxiety makes him barely want to leave the apartment, especially if he will be around a lot of people.  (Tr. 194.)  When he tried to work at two different places in 2019, he said his stress level would get high; he would have panic attacks and hallucinate.  (*Id.*)  His interest for all things he used to like was gone.  (Tr. 195.)  Post traumatic stress syndrome caused nightmares.  (*Id.*)  For personal care, he did not care how he looked or dressed, barely shaved,

bathed or cared for hair every few days, and had a poor appetite.  (*Id*.)  Mr. Hammerly said he

needed reminders to take his medications, for which he set phone alarms.  (Tr. 196.)

      Mr. Hammerly usually ate frozen food, but cooked for 20-25 minutes once or twice a

week.  (Tr. 196.)  He cleaned his apartment once every week and did not go into public settings

like laundromats because of his anxiety.  (*Id*.)  Mr. Hammerly went outside once or twice a week

for about 10 minutes.  (Tr. 197.)  If he traveled, it was on foot or he rode in a car; he did not

drive because he had no car.  (*Id*.)  Mr. Hammerly shopped by phone or computer for common

necessities about once or twice a month.  (*Id*.)  He could count change, handle a savings account,

but could not pay bills because he had no income.  (*Id*.)

      Mr. Hammerly reported that his conditions affected his ability to talk, complete tasks,

concentrate, understand, follow instructions, and get along with others.  (Tr. 198.)  His speech

was affected because he would stutter and lose concentration, and tended to talk too fast.  (*Id*.)

He barely walked and rested after 5-15 minutes.  (*Id*.)  He could not pay attention for very long

and did not finish what he started.  (*Id*.)  He said he did not follow most written instructions well

and asked for those instructions to be repeated.  (*Id*.)  He got along fine with authority figures,

and had not been fired because he could not get along with others.  (*Id*.)

      For hobbies and interests, Mr. Hammerly liked to watch television but struggled to stay

focused.  (Tr. 199.)  He liked playing video games. (*Id*.)  He recently started making models.

(*Id*.)  He barely went around anybody and spent time with others using phone or text.  (*Id*)  He

left the house for groceries, to get produce, for counseling appointments, and to hang out with his

mother.  (Tr. 199-200.)  He went out maybe twice a month for no more than 1-2 hours.  (Tr.

200.)  He said he was not a very social person; people usually annoyed him, and he would think

or hear them saying things about him.  (*Id*.)  He had become "very insecure, depressed, anxious,

nervous, etc., to go anywhere nowadays." (*Id.*)  He also had memory issues and forgot what he was doing or where he just put things, and did not handle stress or changes in routine well.  (Tr. 201.)  He thought everyone was talking about him; he would hear and see things, then ask if others saw or heard it.  (*Id.*)

**D.     Hearing Testimony**

      **1.     Plaintiff's Testimony**

Mr. Hammerly testified before the ALJ on June 15, 2022.  (Tr. 35.)  Asked whether he had trouble motivating himself—where he did not want to get out of bed, talk to anyone, or do anything, Mr. Hammerly—he answered "yes." (Tr. 46.)  He said that this happened about five days per week.  (*Id.*)  The ALJ asked whether Mr. Hammerly had problems focusing, concentrating, and getting along with others.  (*Id.*)  He responded yes, and said he barely spoke to anyone other than his mother and grandmother.  (*Id.*)

Mr. Hammerly reported auditory and visual hallucinations, including voices that told him he could not do things or made him feel like he was a loser. (Tr. 47.)  He said the voices made it hard for him to talk to the ALJ during the hearing.  (*Id.*)  He said his visual hallucinations took the form of shadow beings, and that he sometimes awoke hearing demonic voices.  (Tr. 48.)  That occurred about three times per month.  (*Id.*)  He said his medication had been adjusted to deal with these issues, and the medications helped with the visual hallucinations, but not "so much" with the auditory hallucinations.  (Tr. 49-50.)  He also reported manic symptoms on his "good days," approximately twice a week, after which he crashed hard and just wanted to sleep.  (Tr. 50-51.)  He reported that the medication for his panic attacks was helping; he had not had one in a while.  (Tr. 50.)  He went to counseling once a month; while he did not want to do it at first, he ultimately found it helpful.  (*Id.*)

Mr. Hammerly said he was sleeping better with Trazodone.  (Tr. 51.)  While there were some days that he would not shower, he generally managed his hygiene.  (*Id.*)  His mom did his laundry because he could not go out around people, and he fed himself with frozen food or cooked quick meals, and did his own cleaning.  (*Id.*)  Mr. Hammerly went to the store regularly, twice a month, almost every time accompanied by his mother.  (Tr. 52.)  He spent time on his porch but had problems leaving the house due to paranoia and worries about crime.  (*Id.*)  For recreation, Mr. Hammerly liked to listen to music to keep his voices turned down, and watch shows on television.  (*Id.*)  Mr. Hammerly reported he had been sober from alcohol since October 2019, and was no longer smoking marijuana.  (Tr. 52-53.)

In response to questions from counsel, Mr. Hammerly said that he felt anxious, nervous, and started sweating when he knew he would have to go out.  (Tr. 53.)  It was worse when he was out because he would rush around to get in and out, forgot things, and would not talk to others.  (Tr. 54.)  He felt a little bit more comfortable if his mom was with him.  (*Id.*)  The last time he tried to talk to a neighbor who had come out to talk to him, he had to go inside and told the neighbor "I'm sorry, I can't be out here around you."  (Tr. 55.)  He reported that the voices were telling him negative things, like that he was a loser, and that it took him about an hour to calm down after going inside.  (Tr. 55-56.)

### 2.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Mr. Hammerly's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, could perform representative positions in the national economy, including kitchen helper; laundry worker; and floor waxer.  (Tr. 58-59.)

23

The ALJ then asked the VE to assume a person with the same limitations from the first hypothetical, except the individual could have no interactions whatsoever with co-workers or the general public.  (Tr. 59.)  The VE testified that there was no work for such a person.  (*Id*.)

When asked to consider all the circumstances of the first hypothetical, but with an individual who would be off task 20% of the time and absent three days per month, the VE testified that this would preclude all jobs and that employers would tolerate no more than 10% off task and one absence a month.  (*Id*.)

Mr. Hammerly's counsel then asked the VE if there would be jobs available for a person with the limitations in the first hypothetical who could also not be around the general public or co-workers for three or four days per month.  (Tr. 60.)  The VE responded that this limitation would also be job preclusive, and would be equivalent to absenteeism.  (*Id*.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must
be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a
severe impairment that has lasted or is expected to last for a continuous
period of at least twelve months, and his impairment meets or equals a listed
impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must
assess the claimant's residual functional capacity and use it to determine if
the claimant's impairment prevents him from doing past relevant work.  If
the claimant's impairment does not prevent him from doing his past relevant
work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if,
based on his vocational factors and residual functional capacity, he is
capable of performing other work that exists in significant numbers in the
national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters*

*v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

### IV.     The ALJ's Decision

In the July 11, 2022 decision, the ALJ made the following findings:[1]

1.      The claimant has not engaged in substantial gainful activity since March 4,
2021, the application date.  (Tr. 17.)

2.      The claimant has the following severe impairments: asthma, schizoaffective
disorder, generalized anxiety disorder and major depressive disorder.  (*Id.*)

---

[1] The ALJ's findings are summarized.

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

4.     The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except he can occasionally climb ramps and stairs, ladders, ropes, and scaffolds; avoid concentrated exposure to humidity, extreme heat and extreme cold, dust, odors, fumes, and other pulmonary irritants; can perform simple routine tasks and simple work-related decisions; is limited to occasional interactions with supervisors but only occasional and superficial interaction with coworkers, and the general-public. He can tolerate few changes in a routine work setting.  (Tr. 21.)

5.     The claimant has no past relevant work.  (Tr. 29.)

6.     The claimant was born in 1987 and was 34 years old, defined as a younger individual age 18-49, on the alleged onset date.  (*Id.*)

7.     The claimant has at least a high school education.  (*Id.*)

8.     Transferability of job skills is not material to the determination of disability. (*Id.*)

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including kitchen helper, laundry sorter and floor waxer.  (*Id.*)

Based on the foregoing, the ALJ determined that Mr. Hammerly had not been under a disability, as defined in the Social Security Act, since the alleged onset date through the date of the opinion.  (Tr. 30.)

## V.     Plaintiff's Arguments

Mr. Hammerly presents two assignments of error.  First, he argues that the ALJ erred in evaluating the medical opinion of treating source NP Kriss.  (ECF Doc. 8, pp. 1, 13-20; ECF Doc. 10, pp. 1-3.)  Second, he argues the ALJ erred in evaluating his subjective symptoms. (ECF Doc. 8, pp. 1, 20-24; ECF Doc. 10, pp. 3-10.)

# VI.    Law & Analysis

## A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.     First Assignment of Error: Whether ALJ Properly Evaluated the Persuasiveness of Medical Opinion of Treating Source**

In his first assignment of error, Mr. Hammerly argues that the ALJ erred in his analysis of the persuasiveness of the treating source opinion of NP Kriss.  (ECF Doc. 8, pp. 1, 13-20; ECF Doc. 10, pp. 2-3; *see* Tr. 404-07.)  Specifically, he contends that the ALJ provided an inadequate explanation for his persuasiveness finding, and that his explanation "contained statements that are contrary to the record."  (ECF Doc. 8, p. 15.)  The Commissioner responds that the ALJ considered the opinion evidence, adequately explained his findings, and reasonably concluded that the opinion was not persuasive.  (ECF Doc. 9, pp. 10-13.)

**1.     Legal Framework for Evaluation of Medical Opinion Evidence**

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 416.920c(a); *see Jones*

28

*v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).

The five factors to be considered are supportability, consistency, relationship with the claimant,

specialization, and other factors.  20 C.F.R. § 416.920c(c)(1)-(5).  The most important factors are

supportability and consistency.  20 C.F.R. §§ 416.920c(a), 416.920c(b)(2).  ALJs must explain

how they considered consistency and supportability, but need not explain how they considered

the other factors.  20 C.F.R. § 416.920c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical

evidence and supporting explanations presented by a medical source are to support his or her

medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical

opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(1).  In

other words, "supportability" is the extent to which a medical source's own objective findings

and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or

prior administrative medical finding(s) is with the evidence from other medical sources and

nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior

administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(2).  In other words,

"consistency" is the extent to which a medical source's opinion findings are consistent with

evidence from other medical and nonmedical sources in the record.

The undersigned turns to whether the ALJ's evaluation of the challenged medical

opinions satisfied the regulatory framework for evaluation of medical opinion evidence.

**2.      Whether ALJ Properly Evaluated Opinion Treating Mental Health Provider**

The ALJ evaluated the persuasiveness of NP Kriss's opinion as follows:

In November 2021, the claimant's mental health provider, Mackenzie Kriss APRN,
opined the claimant was unable to remember locations and work like procedures

29

and understand detailed instructions. He had some limitation in his ability to understand simple instructions. He would have significant limitations in his ability to carry out detailed instructions or perform activities within a schedule. He would have some ability to carry out very short and simple instructions and sustain ordinary routine without special supervision [].

In addition, the mental health provider opined the claimant would be unable to work with or proximity with others or make simple decisions. He could not accept instruction and respond appropriately to supervisors. He would have significant limitations to ask simple questions, get along with coworkers, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. The claimant had significant limitations with normal hazards or in his ability to set realistic goals. He would be absent more than four days per month and off task more than twenty percent of the workday and need four unscheduled breaks per day. The claimant had symptoms of anxiety and depression, psychosis that could be severe and can cause issues with or interfere with his ability to maintain or attain employment. He struggled with attendance, following, and understanding instructions and being able to complete tasks correctly due to his mental health symptoms. Stress worsened his symptoms and he reported that he had problems with hallucinations at work. He would require many breaks in-order to get back on task [].

The opinion from the claimant's mental health provider was <u>not persuasive</u> since the limitations described were <u>not consistent with the objective evidence in the treatment record</u>. The mental health provider <u>relied on the claimant's subjective statements about his symptoms. The objective mental status evaluations showed the claimant had some anxiety and depression. However, the claimant was oriented to person, place, and time. His attention and concentration were normal. He was calm and cooperative, and maintained good eye contact. His thought process was logical. There was no clinical evidence, the claimant had paranoia, delusional thinking, or psychotic thoughts</u> [].

(Tr. 28 (citations omitted) (emphasis added).)

Mr. Hammerly's challenge to the above analysis focuses in large part on the ALJ's statement that there was "no clinical evidence" of paranoia, delusional thinking, or psychotic thoughts.  (ECF Doc. 8, pp. 15-20 (citing Tr. 28.).)  He argues: "The ALJ isolated statements from mental status examinations which appeared normal and left out the paranoia, hallucinations, and anxiety that were consistently included in those same mental status examination findings." (*Id.* at p. 19.)  The Commissioner does not directly address this argument, discussing paranoia and hallucinations only in the context of "subjective complaints."  (ECF Doc. 9, p. 11.)  Instead,

he argues more generally that the ALJ adequately addressed supportability and consistency when the opinion is read in its entirety, and that Mr. Hammerly's arguments amount to "a request that this court reweigh the evidence in his favor." (ECF Doc. 9, pp. 10-12.)

To articulate a decision supported by substantial evidence, an ALJ is not "required to discuss each piece of data in [his] opinion, so long as [he] consider[s] the evidence as a whole and reach[es] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)). He may also rely on information articulated earlier in the decision to support his persuasiveness determination, and is not required to rearticulate that information in the opinion discussion. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). However, the ALJ cannot simply "pick and choose" evidence in the record, "relying on some and ignoring others, without offering some rationale for his decision." *Young v. Comm'r of Soc. Sec.*, 351 F. Supp. 2d 644, 649 (E.D. Mich. 2004). In other words, he may not "cherry pick[] select portions of the medical record" to support his findings, but must perform "a proper analysis of the medical evidence under agency regulations and controlling case law." *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013); *see also Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where ALJ was "selective in parsing the various medical reports"). Further, the ALJ's explanation for his rationale must also "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

Here, the ALJ's persuasiveness analysis was based in part on his finding that NP Kriss's opinion was "not consistent with the objective evidence" because the mental status examination findings noted anxiety, depression, and other unremarkable findings, but contained "no clinical

31

evidence[] the claimant had paranoia, delusional thinking, or psychotic thoughts." (Tr. 28.)  This finding in the persuasiveness analysis is also consistent with the ALJ's earlier characterizations of certain specific mental status examinations in the medical records.  (*See, e.g.,* Tr. 23 (referencing Tr. 354-55), Tr. 25 (referencing Tr. 424-25), Tr. 26 (referencing 500-01).)

In fact, Mr. Hammerly's mental status examination findings from both NP Kriss and her successor NP Kashay frequently noted: abnormal thought content in the form of paranoia; racing thought processes; and abnormal perceptions in the form of auditory and/or visual hallucinations. (*See, e.g.,* Tr. 346, 354-55, 377-78, 410-11, 424-25, 436-37, 491-92, 500-01.)  More specifically, at the January 2021 appointment where the ALJ said "[t]here were no clinical signs the claimant had delusional thinking, paranoia, or hallucinations" (Tr. 23), the mental status examination in the medical records noted both paranoia and auditory hallucinations (Tr. 354).  At the October 2021 appointment where the ALJ said "[t]here were no clinical signs of delusional thinking, or unusual behavior" (Tr. 25), the mental status examination noted paranoia and auditory and visual hallucinations (Tr. 424).  And at the January 2022 appointment where the ALJ said "once again, the objective evidence showed no evidence the claimant had delusional thinking, paranoia, or psychotic thoughts" (Tr. 26), the mental status examination noted racing thought processes, paranoia, and auditory and visual hallucinations (Tr. 500).

There are two possible explanations for the ALJ's statements—including in the relevant persuasiveness analysis—that there were "no clinical signs" of delusional thinking, paranoia, or hallucinations.  First, it is possible that the ALJ overlooked or otherwise did not consider the abnormal mental status findings of paranoia, racing thoughts, or hallucinations found throughout Mr. Hammerly's treatment records.  Certainly, the ALJ did not mention those findings in any of his recitations of specific mental status findings throughout the decision (*see* Tr. 23-26) or in his

discussion of specific mental status findings in the persuasiveness analysis (Tr. 28).  To the extent the ALJ failed to consider clinical findings of paranoia or hallucinations while specifically basing his analysis on the absence of such findings, he has mischaracterized the record and failed to base his findings on "upon the record in its entirety," thus depriving his findings of the support of substantial evidence.  *See Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 249 (6th Cir. 2007) (citing *Houston v. Sec'y of Health & Human Servs.,* 736 F.2d 365, 366 (6th Cir. 1984)).

Alternately, the ALJ may have considered the abnormal findings, but concluded—for reasons that are not articulated in his decision—that those findings do not constitute "clinical signs" even though they are recorded in Mr. Hammerly's mental status examination findings. Under the applicable regulations, objective medical evidence includes "signs, laboratory findings, or both."  20 C.F.R. § 416.902(k).  Signs are defined as:

> one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [] statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception and must also be shown by observable facts that can be medically described and evaluated.

20 C.F.R. §§ 416.902(l).  To the extent the ALJ based his persuasiveness analysis on a conclusion that the abnormal mental status findings in question do not constitute "[p]sychiatric signs" under the regulations, he failed to adequately articulate both the fact that he reached that conclusion and the basis upon which he reached the conclusion, and therefore failed to "build an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F. Supp. 2d at 877; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) (explaining an ALJ's analysis "should be specific enough to permit the court to trace the path of the ALJ's reasoning") (citations omitted).

For the reasons set forth above, the undersigned finds the ALJ's persuasiveness finding lacked the support of substantial evidence and the ALJ failed to build a logical bridge between the evidence and the result.  Accordingly, the undersigned recommends that the ALJ's decision be remanded for further proceedings.

## C.     Second Assignment of Error: Whether ALJ Properly Considered Subjective Symptoms

In his second assignment of error, Mr. Hammerly argues that the ALJ erred in his evaluation of subjective symptoms because he failed to explain how the evidence of record is inconsistent with Mr. Hammerly's reported symptoms.  (ECF Doc. 8, pp. 20-23.)  The Commissioner argues in response that the ALJ adequately discussed the relevant evidence, including subjective symptoms, and reasonably concluded that Mr. Hammerly's limitations would not preclude all work.  (ECF Doc. 9, pp. 15-17.)

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 22), so the discussion will be focused on the ALJ's compliance with the second step.

An ALJ should evaluate the severity of the alleged symptoms for mental impairment in light of all relevant evidence, including the factors set out in 20 C.F.R. § 416.929(c).  Those factors include daily activities, types and effectiveness of medications, treatment received to

34

address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. § 416.929(c)(3).  Further, under SSR 96-8p—which sets forth the Commissioner's policies and policy interpretations regarding the assessment of RFCs—an "RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence."  SSR 96-8p, 61 Fed. Reg. 34474, 34478 (July 2, 1996).

Here, the ALJ considered Mr. Hammerly's subjective symptom reports, but concluded that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the] decision," and specifically were "inconsistent because the evidence did not support [Mr. Hammerly]'s assertion that he could not work."  (Tr. 21-22.)  In support, the ALJ discussed and considered Mr. Hammerly's reported daily activities (Tr. 20), his treatment records and medications (Tr. 22-26) and the opinion evidence (Tr. 27-28).

However, as discussed in section VI.B.2., *supra*, the ALJ's discussion and consideration of Mr. Hammerly's mental status findings—in particular, his repeated assertions that the medical records contain "no clinical signs" of paranoia or hallucinations (Tr. 23, 25, 26, 28), despite numerous mental status findings documenting paranoia, racing thoughts, and hallucinations—either mischaracterized the record or failed to build a logical bridge between the evidence and the result by failing to explain why the relevant mental status findings were not "clinical signs." Given that the absence of these "clinical signs" was part of the ALJ's stated grounds for finding Mr. Hammerly's subjective complaints of paranoia and hallucinations "not entirely consistent with the medical evidence," the undersigned concludes that the ALJ's findings regarding Mr.

Hammerly's subjective symptom reports lacked the support of substantial evidence and failed to build a logical bridge between the evidence and the result.

For the reasons set forth above, the undersigned recommends that the ALJ's decision be remanded for further proceedings.

### VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the Court **VACATE** and **REMAND** the final decision of the Commissioner for further proceedings consistent with this Report and Recommendation.  On remand, the ALJ should consider all evidence of record and provide a clear and accurate explanation for his findings as to the persuasiveness of the medical opinion evidence and Plaintiff's subjective symptom reports, accurately characterizing the medical evidence and building a logical bridge between the evidence and the result.

May 28, 2024

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 Dated: April 17, 2023(1985).